IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


David McWhorter, et al.,          :

         Plaintiffs,              :

    v.                            :    Case No. 2:00-cv-473

Elsea, Inc., et al.,             :     MAGISTRATE JUDGE KEMP

         Defendants.             :

<u>OPINION AND ORDER</u>

     This class action lawsuit is before the Court on cross-motions
for summary judgment filed by the plaintiffs, David and Andrea
McWhorter and the class they represent (collectively known as
"plaintiffs"), and defendants, Elsea, Inc., Elsea Financial
Services, Inc. d/b/a Mid-Ohio Financial Services ("Mid-Ohio") and
Elsea Insurance Agency (collectively known as "defendants").
Additionally, the plaintiffs request the Court to specify in its
ruling what material facts are and are not in controversy for trial
purposes pursuant to Fed.R.Civ.P. 56(d).  For the following
reasons, both motions for summary judgment are granted in part, and
denied in part.

I.

     This case has been pending for almost seven years.  In the
amended complaint, the plaintiffs seek relief for violations of the
Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.* and
Regulation Z; the Fair Debt Collections Practices Act ("FDCA"), 15
U.S.C. §§ 1692, *et seq.*; the Equal Credit Opportunity Act ("ECOA"),
15 U.S.C. §§ 1691 *et seq.*; the Fair Credit Reporting Act ("FCRA"),
15 U.S.C. §§ 1681 *et seq.*; the Ohio Consumer Sales Practices Act
("CSPA"), Ohio Revised Code §§ 1345.01 *et seq.*; common law fraud;
breach of contract; the Ohio Retail Installment Sales Act ("RISA"),

Ohio Revised Code §1317.01; and the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq*. (Am. Compl. ¶¶ 83-103). On September 11, 2003, the Court granted in part and denied in partial motion for partial summary judgment filed by the defendants. The Court concluded that there were genuine issues of material fact relating to the common law fraud allegations as well as violations of the TILA, the RISA, and the CSPA as it related to charging excessive insurance rates and failing to deliver goods. (Opinion and Order (doc. #76)). Additionally, the Court dismissed all the claims arising under the FDCA, the ECOA, the FCRA, and the CSPA as it relates to the three-day eviction notice that the McWhorters received. (Id.)

Plaintiffs now seek summary judgment on all remaining claims. First, the plaintiffs seek relief for all claims involving the charging of excess insurance rates. This includes the common law fraud claim and alleged violations of the RISA and the CSPA. Second, the plaintiffs seek summary judgment on the claims involving the defendants' failure to make repairs to the manufactured homes purchased and covered by warranty. This includes alleged violations of the CSPA and the MMWA. Third, the plaintiffs argue that summary judgment is appropriate on the TILA claim because the defendants failed to make all required disclosures. Fourth, the plaintiffs contend that the defendants violated Ohio law by not delivering their mobile home skirt within the requisite amount of time prescribed. Fifth, the plaintiffs requests that the Court reconsider the Court's prior dismissal of the ECOA claim because of a purported change in law. Finally, the plaintiffs seek injunctive relief (1) to prevent the future sale of mobile home insurance on a consent-to-rate basis; (2) to ensure that the defendants perform requested and warranty required repairs; and (3) to prohibit the defendants from charging financing fees as closing costs.

Conversely, the defendants move for summary judgment on the common law fraud claim. The defendants also seek summary judgment for claims involving the alleged warranted repairs of the purchased manufactured homes, which include the alleged violations of the CSPA and the MMWA. Finally, the defendants request summary judgment on all claims for injunctive relief.

II.

Fed. R. Civ. P. 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original); Kendall v. The Hoover Co., 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is,...[and where] no genuine issue remains for trial,...[for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Systems,

Inc., 368 U.S. 464, 467 (1962); accord, County of Oakland v. City of Berkley, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson, 477 U.S. at 250.

> The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (footnote omitted); accord, Adams v. Union Carbide Corp., 737 F.2d 1453, 1455-56 (6th Cir.1984), cert. denied, 469 U.S. 1062 (1985). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Watkins v. Northwestern Ohio Tractor Pullers Association, Inc., 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the

4

moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. <u>Adickes</u>, 398 U.S. at 157-60; <u>Smith v. Hudson</u>, 600 F.2d 60, 65 (6th Cir.1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. <u>Anderson</u>, 477 U.S. at 251. As is provided in Fed. R. Civ. P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 259 (1968)(footnote omitted).

### III.

The following facts are pertinent to the pending motions and are largely undisputed. Elsea is a corporation engaged in selling and servicing new and used manufactured homes in Ohio. It has sales offices throughout Ohio. Mid-Ohio is exclusively owned by Elsea and provides financial services to customers who seek to purchase or have purchased manufactured homes from Elsea. Additionally, Elsea Insurance Agency provides various types of

5

insurance to customers who seek to purchase or have purchased manufactured homes from Elsea.

The McWhorters, and the class they represent, are individuals who purchased or will purchase manufactured homes from Elsea. The specific details of their claim are illustrative of the claims advanced on behalf of the class.

In January 1999, the McWhorters visited an Elsea sales office in Piketon, Ohio with the interest of purchasing a used manufactured home. Initially, the McWhorters offered to buy a 1988 Redman home for $17,400. To purchase this home, the McWhorters completed a credit application, and Elsea obtained the McWhorters' credit report. According to the record, Bank One agreed to purchase the retail installment contract for the 1988 Redman at a 9% annual interest rate for 120 months and a 10% down payment. Elsea never informed the McWhorters of Bank One's rates. Instead, Mid-Ohio offered the McWhorters a retail installment contract for the purchase of the 1988 Redman at 14.99% annual interest rate for 144 months with a $1500 cash down payment. This proposal would have required a $240 monthly payment, which the McWhorters believed they could not afford.

The McWhorters returned to the Elsea lot in March 1999. During this visit, the Elsea salesperson showed the McWhorters a 1973 Hillcrest manufactured home with a purchase price of $8,900. The salesperson informed the McWhorters that the 1973 Hillcrest came with a 30-day warranty on the furnace, water heater and plumbing. The McWhorters again filled out a credit application, and Elsea obtained a credit report. After reviewing the McWhorters' credit report, Mid-Ohio offered a 14.99% annual interest rate for 108 months with a $550 down payment. The McWhorters agreed to the deal, signed the requisite paperwork, including a Form 500, paid the required fees, and purchased the home.

Approximately one month later, the manufactured home was delivered to the McWhorters' property in Vinton County. Upon hooking up the water to the home, they discovered serious leaks in the plumbing, which caused them to disconnect the water. The hot water tank also leaked and did not work properly. As a result of these problems, the McWhorters claim that they were unable to cook, clean or bathe at their home.

The McWhorters notified Elsea of the leaks and hot water tank malfunction. Elsea claims that it was not able to return the McWhorters' phone call to establish an appointment because the McWhorters did not have a home phone. Elsea did have a phone number on file for a McWhorter family relative, but that phone did not have an answering machine to leave a message. Finally, the McWhorters sought a remedy under their 2-10 warranty, but they discovered that under the 2-10 there was a $75 "deductible," in addition to the service cost, every time that Elsea made a trip to repair a home.

Elsea installed the mobile home skirt in March 2000, nearly ten months after the McWhorters purchased the home. Due to the leaks and other problems at the home that were never repaired, the McWhorters withheld their monthly payments. Accordingly, Elsea turned over the retail installment contract to collections. This lawsuit ensued.

### IV.

One of plaintiffs' claims is that the defendants charged them more for insurance on their mobile home than they were legally allowed to charge. The record is clear that the defendants charged insurance rates that were in excess of the rates which the defendants had previously filed with the Ohio Department of Insurance ("ODI"). Accordingly, the plaintiffs seek relief for charging the excessive insurance rates under Ohio common law, as well as violations of the RISA and the CSPA.

7

Generally, a party selling insurance may not charge a customer a premium that is higher than a rate which is on file with the Ohio Department of Insurance. However, both O.R.C. §§ 3935.04(G) and 3937.03(G) state that "[u]pon the written application of the insured, stating his reasons therefor, filed with and approved by the superintendent, a rate in excess of that provided by a filing otherwise applicable may be used on any specific risk." The plaintiffs argue that a search of ODI records indicates that the defendants failed to file any request to charge excess insurance rates. (Plaintiffs' Mot. for Summ. Judgment, Exs. 14-15). The ODI records relied on by the plaintiffs were certified by the ODI director and do not show that the defendants filed a request to charge excessive rates.

Conversely, the defendants cite the affidavit of Eugene Stetler, the purported custodian of the insurance records at issue, which indicates that

> From February 1, 1998 through December 31, 1999, Elsea Insurance began to sell manufactured housing coverage on a "Consent to Rate" basis through American Family due to Elsea Insurance's adverse loss experience.
>
> A true and accurate copy of the "Consent to Rate" schedule in effect for Elsea Insurance beginning in February 1998 is attached hereto as Exhibit F-1.
>
> A true and accurate copy of American Family's quarterly report showing that it made Consent-to-Rate filing for the insurance policy issued to David McWhorter, policy number 070 0002689389, is attached as Exhibit F-2.

(Defendants' Mot. for Recon., Ex. 7, ¶¶2-4). Additionally, in response to the fact that no excessive insurance rate documentation was found in the ODI record search, the defendants claim that the plaintiffs did not search the correct documents. The defendants also suggest that because ODI changed its excess insurance rate

filing policy, there is a possibility that all previously filed
excess insurance rate requests were destroyed.

A. *Common Law Fraud*

Both the defendants and the plaintiffs move for summary
judgment on the issue whether the defendants committed common law
fraud for charging excess property insurance rates.  According to
the record, the McWhorters and members of the class were asked to
sign the "Consent To Rate" and "Physical Damage Insurance
Disclosure" form to inform the buyers that they were paying a
higher rate of insurance due to "adverse loss experience" in
accordance with Ohio law.  (Am. Compl., Ex. 7; <u>see</u> <u>also</u> Dep. of
Mary Ellen Harrison-Reed at p. 88).  The "Consent to Rate Form"
states:

> Pursuant to Ohio Insurance Laws 3935.04(G) and
> 3937.03(G) O.R.C., I (we) certify that I (we)
> am fully aware of and in agreement with the
> rate outside of the approved filing being
> charged for my (our) manufactured housing
> insurance coverage.  The reason for my special
> rating has been explained to me and is as
> follows: **Adverse Loss Experience**.

(Am. Compl., Ex. 7). The "Physical Damage Insurance Disclosure
Form" states, in relevant part:

> Further, I authorize the lender to purchase
> coverage with rates in excess of the approved
> filing pursuant to Ohio Insurance Laws
> 3935.04(G) and 3937.03(G) O.R.C.  The reason
> for this special rating has been explained to
> me and I am fully aware of the excess rates
> which will be charged should I default under
> the conditions  described herein.

(<u>Id.</u>)

Both Andrea and David McWhorter signed both forms on May 25,
1999.  The record indicates that at closing, the McWhorters were
instructed before signing the "Consent To Rate Form," "[t]his is
where you're consenting to the rate we charge here in Ohio."

9

(Plaintiffs' Mot. for Summ. Judgment (doc. #142), ex. 13 at p. 11).

The plaintiffs contend that these forms, along with the information they received from Elsea at closing, amounted to a misrepresentation that they were paying a rate for property insurance that was approved by the insurance industry.  The plaintiffs argue that

> Elsea [and the other defendants] were engaged in a common and continuing course of fraud in pricing of voluntary and forced placed property damage policies, and are therefore liable to plaintiffs and the class for all actual and punitive damages flowing from those fraudulent practices.  Using consent to rate and disclosure forms to "advise the customer that these rates are approved by the insurance industry" is per se fraudulent since those rates were never filed with or approved and were never legally imposed.

(Id. at p. 30).

Contrarily, the defendants argue that when the plaintiffs signed the "Consent to Rate Form," they acknowledged and consented to being charged higher insurance rates.  Because of this, the defendants contend that they made no false representation. Additionally, the defendants claim that because the McWhorters were instructed that they were "consenting to the rate we charge here in Ohio" and they complied with Ohio law for charging excess insurance rates, no false representations was made.

In order to prove fraud in Ohio, a plaintiff must prove

> (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the

10

reliance.

Gaines v. Preterm-Cleveland, Inc., 33 Ohio St.3d 54, 55 (1987). In fraud claims, the plaintiff has the burden of proving that the defendant knowingly or intentionally deceived or misled the plaintiff. Doyle v. Fairfield Machine Co. Inc., 120 Ohio App.3d 192, 208 (1997). "Fraudulent conduct may not be established by conjecture; it must be proved by direct evidence or justifiable inferences from established facts." Id. Whether fraud exists is generally a question of fact. Carpenter v. Scherer-Mountain Ins. Agency, 135 Ohio App.3d 316, 328 (1999). When the plaintiffs fail to produce sufficient evidence from which a jury could find in their favor, however, granting a motion for summary judgment is appropriate. Doyle, 120 Ohio App.3d at 208.

The issue of whether the defendants complied with Ohio insurance law to charge excess insurance rates is paramount in determining whether the defendants committed common law fraud. On the one hand, the defendants have proffered a sworn affidavit indicating that the defendants complied with Ohio insurance law and sought permission to charge excess insurance rates to the plaintiffs. In fact, the McWhorter policy number associated with the excess rate is identified in the affidavit. The defendants also contend that the ODI policy no longer requires filing excess rates on a quarterly basis, so defendants speculate that ODI destroyed its previous filings. On the other hand, the plaintiffs present evidence suggesting that a search of ODI records does not confirm that the defendants required permission to charge excess rates.

Based on the conflicting testimony surrounding the alleged filing of the excess insurance rate schedule with the ODI, there is a factual dispute about whether the defendants made a filing for excess rates in accordance with Ohio law. Thus, a reasonable jury could conclude, or not conclude, that the defendants made false

11

representations by charging excess insurance rates outside the confines of Ohio law or without permission from the ODI while, at the same time, representing to customers that the excess rates charged were in accordance with Ohio Rev. Code §§ 3934.04(G) and 3937.03(G). Accordingly, because of the conflicting testimony and evidence surrounding whether the defendants complied with Ohio insurance law by filing and requesting approval for charging excess insurance rates, the Court must conclude that there are genuine issues of material fact on this issue.

### B. *RISA* and *CSPA*

Plaintiffs' claims arising under the RISA, as well as some of the claims under the CSPA, involve the defendants charging excess insurance rates without allegedly filing paperwork and receiving permission from ODI in violation of Ohio Rev. Code §§ 3934.04(G) and 3937.03(G). The plaintiffs claim that these failures amount to a violation of the RISA and the CSPA. As noted, *surpa*, however, genuine issues of material fact surround whether the defendants properly filed the requisite paperwork with ODI prior to charging excess insurance rates. Thus, with respect to the state law claims involving the charging of excess insurance rates, there are also genuine issues of material fact involved in determining whether the defendants violated the RISA and the CSPA.

### V.

The plaintiffs also make a claim concerning repairs (or the lack of repairs) to their mobile home. At closing, the McWhorters signed a Form 500 purchase contract that stated, *inter alia*, that the manufactured home's furnace, water lines and hot water tank were operative and guaranteed under warranty for 30 days. (Am. Compl., Ex. 4). The home was delivered to the McWhorters' lot in Vinton County and the electricity and water were connected. Immediately, the McWhorters discovered that the pipes leaked water and the hot water heater did not function properly.

The McWhorters subsequently contacted Elsea to inform it that the water heater failed to work and that there were leaks in the pipes in the kitchen and under the floors. (Dep. of Andrea McWhorter at p. 96). Elsea stated that it would send someone to fix the problems. No one came, so the McWhorters called again. Andrea McWhorter states:

> Q. Okay. And it was at that time that you called Elsea?
>
> A. Yes.
>
> Q. Who did you talk to?
>
> A. I can't remember. The only person I believe I knew of there was the guy's name who was suppose to deliver it, which would have been Rick Cottrill, and he just passed me on to different departments that would handle that.
>
> Q. What did you tell them at that time?
>
> A. Who I was, that my hot water tank was leaking, you know, it wouldn't hold water, it wouldn't heat, the floors were bad, the kitchen water line was leaking.
>
> Q. Where you living in the home at this point?
>
> A. Yes.
>
> Q. Do you know approximately when this was?
>
> A. When what?
>
> Q. When you started making these calls to Elsea?
>
> A. Yes. In June.
>
> Q. Okay. When in June?
>
> A. About the third week of June.
>
> Q. When you finally spoke with someone, what

13

did they tell you about the leak?

A. They said they would get someone to fix it.

Q. Okay.  What happened next?

A. No one ever[] came out.

Q. Did you make another phonecall [sic]?

A. Yes.

Q. When was that?

A. A day or two after that.

Q. Who did you speak with?

A. I'm not for sure on that call.  I did speak with a "Gregg Dalton" and a "Belinda Greeno."

Q. Tell me about that conversation?

A. I told them what was going on.  They said they would send someone out.  There was a guy coming from around some place called "Shade," that he would come out.  They made times that they would be out.  I would wait and wait, and I didn't have a phone at the house at the time, so I would go down to the neighbor's or to Crosscreek or to my mother's, ... and make calls to them, and they said they would be out, and they never showed up.

Q. So you left the house and nobody was at the house to go and make the phone call to see where they were?

A. Yes.

***

Q. Okay.  How long did this go on that you were calling [Elsea] and trying to get something set up for someone to look at the water tank?

A. For around six months.

14

\* \* \*

Q. Okay. It's my understanding that at some point – or at least in your Complaint you allege that you contacted your "2-10 Warranty Company"?

A. Yes, I did.

Q. What number did you use to contact them?

A. The 800 number that's located in the pamphlet.

\* \* \*

Q. So you called 1-800-775-4376?

A. 4736.

Q. 4736. Thank you. And when did you make that call?

A. About around I would say three months after living there when they wouldn't come out to do anything.

Q. What happened when you called it?

A. I can't remember who I talked to. I told them the problems I was having. I asked how much it would be for them to come out, how long they thought it would take to get everything done. With the floors on the list, it would take more than one day of course, and it would cost $75 each time they had to come out for each repair they had to do.

Q. Okay. And did you make arrangements then for them to come out and do the repairs?

A. No.

Q. Why not?

A. Because I didn't have $75 for each repair, for each thing and for however many days it would take for them to be out there.

15

(Id. at 97-99; 107; 109-110). In response, the defendants claim that they attempted to arrange times to come to the McWhorters' home to repair the water heater and pipes, but, because the McWhorters did not have a phone, the defendants could not get in contact with them. The defendants also claim that they attempted to reach the McWhorters at the number they provided, but that number did not have an answering machine to leave a message.

### A. *Express Warranties*

It is undisputed that in the Form 500 agreement presented by Elsea and signed by the McWhorters, Elsea expressly stated:

> 1. The seller of this mobile home sells it "as is" and assumes no responsibility for defects.
>
> 2. The purchaser of this mobile home must accept it with all defects and take the entire risk, under contract law, as to its condition.
>
> 3. The purchaser represents they have examined the mobile home and found it acceptable.
>
> 4. Furnace will operate. 30 days
>
> 5. No utility connections are included in the purchase of any used home.
>
> 6. Water lines and water tank will hold water. 30 days

(Am. Compl., Ex. 4). What is in dispute, however, is whether the defendants violated these express warranties. Upon discovering the defects in the manufactured home, the McWhorters contacted Elsea to remedy the problems. Elsea never showed up. Nevertheless, the defendants claims that they did attempt to contact the McWhorters, but those efforts failed because the McWhorters did not have a home telephone. Additionally, the defendants claim that they attempted to contact McWhorters at the contact number presented to them, but that phone did not have an answering machine. The issue, therefore, is not whether the express warranties existed; rather,

16

the focus in on whether the defendants violated these warranties in their attempt, or lack of an attempt, to remedy the problems at the McWhorters' home. Clearly, based on the conflicting evidence presented by the parties, genuine issues of material fact exist regarding whether the defendants violated these express warranties.

### B. *CSPA*

It is a violation of the CSPA to tell a customer that a product was "under warranty" and then refuse to take any action to fix the problem. Ohio Rev. Code § 1315.02(10); see also Fletcher v. Don Foss of Clev., Inc., 90 Ohio App.3d 82, 87 (8th Dist.1993)("Thus, under this subsection, it would be a violation of CSPA to tell a consumer that something was "under warranty" and then refuse to take any action to remedy a problem when the goods promptly break down ..."). For the reasons stated above, genuine issues of material fact surround whether the defendants, given the alleged difficulty in communication between them and the McWhorters, breached the expressed warranties written into the Form 500 signed by the McWhorters. Thus, genuine issues of material fact exist in determining whether the defendants violated the CSPA.

### C. *MMWA*

Preliminarily, the Court notes that the claims arising under the MMWA are not class action claims. (See Am. Compl. ¶103). The amended complaint expressly states that "Elsea, Inc. has violated its obligations to plaintiffs under the UCC and the [MMWA], 15 U.S.C. §2301 et seq. and its implementing regulations." (Id.) However, the title of this section in the amended complaint is "Individual Claim of Named Plaintiffs Only." (Id. at p. 14 (emphasis omitted)). From the plain language of the complaint, all claims arising under the MMWA are alleged by the McWhorters *only*, not the class.

Preliminarily, the Court will analyze the jurisdictional aspect of the MMWA to the case at bar. The MMWA states that "a

consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. §2310(d)(1). A court's jurisdiction over MMWA claims, however, is subject to the amount in controversy requirement outlined in 15 U.S.C. §2310(d)(3)(B), which provides, "No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection ... (B) if the amount in controversy is less than the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit." In the instant case, despite the fact that the prayer for relief for the alleged MMWA violation is "[t]o award plaintiffs damages in excess of $25,000.00 under their individual cause of action ..." (Am. Compl. at p. 15), which is clearly under the jurisdictional threshold, the Court retains pendent jurisdiction for the McWhorters' MMWA claim because all other class claims are properly before the Court. See, e.g., Chavis v. Fidelity Warranty Services, Inc., 415 F.Supp.2d 620, 624-25 (D.S.C.2006)("The court finds that federal jurisdiction may be appropriate for [MMWA] claims that fail to satisfy the requirements of 15 U.S.C. § 2310(d)(1)(B) if a valid alternative federal jurisdiction basis exists"); Barnes v. West, Inc., 249 F.Supp.2d 737, 739 (E.D.Va.2003)("Thus, [MMWA] claims that cannot be independently be heard in federal court owing to the absence of the requisite amount in controversy, can still be heard in federal court in circumstances where supplemental jurisdiction is properly exercised ..."). The Court will now turn to the substantive arguments.

The plaintiffs argue that the defendants violated the MMWA because they failed to fix the items under express warranty listed in the Form 500. In response, the defendants claim that because the manufactured home was constructed in 1973, the MMWA does not

18

apply because the express language of 15 U.S.C. § 2312 prohibits application of the MMWA to any product manufactured before June 4, 1975. _See_, 15 U.S.C. § 2312(a)("Except as provided in subsection (b) of this section, this chapter shall take effect 6 months after January 4, 1975, but shall not apply to consumer products manufactured prior to such date").

In the instant case, it is undisputed that the McWhorters purchased a 1973 manufactured home from the defendants. There is no evidence in the record indicating that any of the warranted parts in question – namely the pipes, water heater or furnace – were replacement parts manufactured after June 4, 1975. _See_, _e.g._, 16 C.F.R. § 700.1(h)("Warranties on replacement parts and components used to repair consumer products are covered ..."). Because the McWhorters' manufactured home was manufactured prior to the effective date of the MMWA, the McWhorters' manufactured home cannot be covered under the MMWA. Further, because there is no evidence in the record, either direct or circumstantial, that the warranted parts at issue were replaced by parts manufactured after June 4, 1975, the MMWA cannot extend specifically to those parts. Accordingly, the McWhorters' MMWA claim must be denied.

VI.

The plaintiffs move for summary judgment on two alleged violations of the TILA and one violation of the RISA. First, the plaintiffs claim that the defendants failed to make truthful and accurate disclosures before the McWhorters signed the Form 500. Second, the plaintiffs claim that the defendants failed to truthfully and accurately disclose the finance charges, annual percentage rate and the amount financed. Finally, the plaintiffs contend that the $375 fee charged at closing violated the RISA.

A. _TILA – failure to make proper disclosures_

At issue is whether the Form 500 signed by the plaintiffs is a credit transaction that would trigger TILA disclosures and

19

protections.  According to the defendants, the Form 500 was not a retail installment contract subject to the TILA; rather, the defendants argue that the Form 500 was a purchase agreement in which the seller promises to sell the manufactured home and the buyer promises to buy it, either by paying cash or financing the purchase.  Because there was an option to pay cash, and thus avoid any credit transaction, the defendants argue that the TILA does not apply and no disclosures were required.

The Form 500 appears to be a document signed by the plaintiffs detailing information regarding, *inter alia*, the type of manufactured home purchased, optional equipment and accessories, express warranty information, pricing and financing information. (Am. Compl., Ex. 4).  There are also other terms outlined on the Form.  The Form 500 states, in pertinent part:

> In this contract the words I, me, and my refer to the Purchaser and Co-Purchaser signing this contract.  The words you and your refer to the Retailer.
>
> I understand that the term "unit" used in this agreement describes the Mobile-Manufactured Home or any item or combination of items as described on the front of this agreement.
>
> I further agree (continued from other side of Contract):
>
> 1.  **IF NOT A CASH TRANSACTION.**  If I do not complete this purchase as a cash transaction, I know before or at the time of delivery of the unit purchased, I will enter into a retail installment contract and sign a security agreement or other agreement as may be required to finance my purchase.

(Id. (emphasis in original)).  After the Form 500 was signed and the next phase of closing completed, the plaintiffs did receive the TILA disclosures prior to signing a retail installment contract to purchase the manufactured home.

As the Court of Appeals succinctly summarized:

> Enacted in 1968, the TILA imposes mandatory disclosure requirements on those who extend credit to consumers. 15 U.S.C. § 1601, et seq. The TILA was specifically designed to remedy problems that had developed from the rapidly expanding use of consumer credit in the 1960s. The purpose of the TILA, as stated by Congress, is as follows:
>
> It is the purpose of this title ... to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit....
>
> 15 U.S.C. § 1601(a). The Federal Reserve Board has been delegated the power to promulgate regulations to carry out the TILA's purpose. 15 U.S.C. § 1604. These regulations, among other things, mandate specific disclosures in credit transactions. See 12 C.F.R. § 226. In the event that a creditor fails to disclose any of the credit terms required under the TILA and its regulations, a consumer may bring a civil action against the creditor. 15 U.S.C. § 1640. If a violation is proven, the consumer may recover twice the amount of the finance charge (but not less than $100.00 nor more than $1,000.00). *Id.* at § 1640(a)(2)(A). The purpose of the statutory recovery is "to encourage lawsuits by individual consumers as a means of enforcing creditor compliance with the Act." *Watkins v. Simmons & Clark, Inc.*, 618 F.2d 398, 399 (6th Cir.1980). The TILA also permits recovery of reasonable attorney's fees and costs. 15 U.S.C. § 1640(a)(3). A plaintiff in a TILA case need not prove that he or she suffered actual monetary damages in order to recover the statutory damages and attorney's fees. *Watkins*, 618 F.2d at 399. Nor is it necessary to show that the consumer was actually misled or deceived by an ambiguous credit term in order to prevail. *Smith v. Chapman*, 614 F.2d 698, 671 (5th Cir.1980); *Millhollin v. Ford Motor Credit*

*Co.*, 531 F.Supp. 379, 386 (D.C.Or.1981).

Purtle v. Eldridge Auto Sales, Inc., 91 F.3d 797, 800-01 (6th Cir.1996).

The specific timing and content of the required disclosures are outlined in Regulation Z.  15 U.S.C. § 1638(a); 12 C.F.R. §§ 226.2(a)(13) and 226.18.  Regulation Z requires creditors to disclose the identity of the creditors, the amount being financed, the annual percentage rate, the total sale price and the total amount of payment.  15 U.S.C. § 1638(a); 12 C.F.R. §§ 226.18.  The requisite disclosures must be made before credit is extended to a consumer, a point known as "consummation."  "Consummation" means that a consumer becomes contractually obligated on a credit transaction.  12 C.F.R. § 226.2(13).

Each party primarily relies on a different case as being controlling authority on this issue.  The plaintiffs cite Copley v. Rona Enterprises, Inc., 423 F.Supp. 979 (S.D. Ohio 1976), and the defendants cite Alvarez v. Galassi AMC-Jeep, Inc., No. 78 C 3802, 1979 U.S. Dist. LEXIS 11166 (N.D. Ill. July 9, 1976).  In Copley, the plaintiffs signed a Form 100 purchase agreement prior to buying a mobile home.  The defendants did not recite the requisite TILA disclosures prior to the plaintiffs' signing the Form 100, so the plaintiffs sued for a violation of the TILA.  The pertinent facts are best summarized by the court:

> The April 24, 1974, agreement to which plaintiffs and defendant Rona are signatories is styled "Form 100 Purchase Agreement UCC s 2-201."  The document provides that "subject to the terms and conditions stated on both sides of this agreement seller (defendant Rona) agrees to sell and the purchaser (plaintiffs Delbert and Dicie Copley) agrees to purchase [the mobile home]."  Rona signed on a line under which appeared the following language: "Approved, Subject to acceptance of financing by bank or finance company."  The first numbered paragraph on the reverse of the

document is underlined and contains the following language:

> In the event the transaction referred to in this order is not a cash transaction, the purchaser herein before, or at the time of delivery of the trailer, mobile home or vehicle ordered, and in accordance with the terms and conditions of payment indicated on the face of this order, will either execute a retail installment contract, security agreement, or such other form of agreement as may be required by law. Title to said equipment shall remain in the Seller, until the agreed purchase price therefor is paid in full in cash, or a time payment contract has been executed, and acceptance by a bank or finance company; thereupon title passes to purchaser even though actual delivery may be made at a later date.

> The fifth numbered paragraph on the same side of the document is as follows: Upon failure or the refusal of the purchaser to complete said purchase within 30 days of contract date, or an agreed extension thereof for any reason (other than cancellation on account of increase in price) the cash deposit may have such portion of it retained as will reimburse the dealer for expenses and other losses including attorney fees occasioned by purchaser's failure to complete said purchase. ****

Copley, 423 F.Supp. at 980-81.

Based on the language and terms of the Form 100, the court concluded that the defendants were obligated to provide the TILA disclosures. The court opined:

> The April 24, 1974, purchase agreement signed by the Copleys and by defendant Rona is by its terms a contract for the extension of credit. *** While Rona's "approval" of the agreement is expressly contingent upon acceptance of financing, the purchaser's responsibility under the agreement is unconditional. ***

23

> It is apparent, then, that under the terms of the April 24, 1974, agreement, plaintiffs contractually bound themselves not only to purchase the mobile home, but also to purchase it on the credit terms set out on the face of the purchase agreement. Rona Enterprises Inc. retained for itself the right to withdraw its agreement to sell, if financing was unavailable, but Rona left the purchasers no independent contractual right to escape the credit terms of the purchase agreement. Rona secured from plaintiffs an unconditional promise to accept specific credit terms; such a promise renders a contract one for the extension of credit. ****

Id. at 982.

In Alvarez, the plaintiff consumer claimed TILA violations because the defendant dealer allegedly failed to provide TILA disclosures prior to purchasing an automobile. The plaintiff in Alvarez went to a dealership to purchase a car on November 12, 1977. Once the car was selected, the plaintiff signed a purchase order

> where by she agreed to purchase the auto for $2,100.00, including $100.00 sales tax .... The document, also signed by defendant's salesman ... shows that a deposit of $10.00 was "submitted with order", that "cash to be paid at time of delivery" was $250.00, that "balance due cash" was "none", and that "balance to be financed" was $1,840.00. It was clear to both parties that [the plaintiff] wanted to buy the car on credit ... and that defendant would take steps necessary to arrange or seek to arrange for it. Defendant advised [the plaintiff] that a bank would have to be consulted regarding the financing ... and that credit information about both her and her father would be necessary .... ***

> On November 22, following a call from defendant ... [the plaintiffs] went to defendant's place of business and signed a Retail Installment Contract headed

24

> "Heritage/Pullman Bank" ... which document
> contains a "Disclosure Statement" itemizing
> amounts for the cash price, down payment,
> credit insurance, amount to be financed,
> finance charge, total payments, annual
> percentage rate, and other related
> information. ****

Alvarez, 1979 U.S. Dist. LEXIS 11166, *2-*4.  The plaintiffs argued
that all TILA disclosures were required prior to the signing of the
November 12 purchase order.  The court disagreed stating that the
arrangement was a "two-note" transaction

> wherein the first note is a purchase order for
> merchandise between a buyer and a seller who
> also arranges credit and the second note is an
> agreement between the buyer and the extender
> of credit for an installment loan on the
> merchandise of the first note ... .
>
> ***
>
> Plaintiffs herein have not persuaded the court
> that [the plaintiff] was, by the note of
> [November 12], obligated to accept the
> financing offered by Heritage/Pullman Bank; it
> only obligated her to purchase the car.  (The
> court finds that the words of the purchase
> order indicating that the balance of $1,840.00
> was to be financed and that "no credit has
> been extended to [purchaser] for the purchase
> of this motor vehicle..." do not constitute a
> contract between plaintiff and defendant for
> the latter to extend credit or for the former
> to be bound to financing arranged, after the
> signing of the purchase order, by the
> defendant.)  Consequently, we hold that,
> although the [TILA] requires that in closed-
> ended credit plans disclosure "shall be made
> before the credit is extended," by words of §
> 1638(b), construed with the remainder of the
> Act and Regulation Z, such disclosure was not
> required at or before the signing of the
> purchase order contract in the instant cause.

Id. at *10-11, *17.

In comparing the two cases, the Court concludes that the signing of the Form 500 and the subsequent signing of the Retail Installment Contract is like the transaction in Copley.  Like Copley, the plaintiffs in the instant case signed a Form 500 that bound them to purchase the manufactured home either by cash or credit.  By not paying cash, the plaintiffs contractually bound themselves not only to purchase the manufactured home, but also to purchase it on the credit terms set by the defendants.  Making no TILA disclosures at this time circumvents the entire purpose of the law, namely to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.  The defendants, by skipping this step, placed plaintiffs in a situation where, if the plaintiffs did not have the ability to pay cash, they were bound by whatever credit terms Elsea created without disclosing those terms to the plaintiffs.  The Form 500 left the plaintiffs no independent contractual right to abandon the contract if the plaintiffs, after finally receiving the TILA disclosures in the future, were unhappy with the terms.

The Court in Alvarez, by citing, inter alia, Copley, identifies this type of transaction as requiring TILA disclosures prior to signing the Form 500.  Id. at *12-13.  Alvarez recognizes that some transactions, although requiring a two-step process where the first step is an agreement to buy (using either cash or credit) and the second step is the extension of credit, are a single integrated credit sale requiring the seller to disclose all credit terms prior to the consumer signing the purchase agreement.  Id. at *13-14.  Alvarez, however, citing the plain text of the TILA, disagrees with this interpretation:

> While the complaint alleges that defendant both arranged for and extended credit to plaintiffs, defendant admits only to the former and the facts do not substantiate

26

> defendant as an extender of credit.  Clearly
> defendant submitted the credit history
> supplied by Lourdes Alvarez, as well as the
> terms of the purchase order, to the bank.  In
> so doing, it "arranged for" credit.  But the
> Heritage/Pullman Bank "extended" the loan, and
> the date of that extension is no earlier than
> the twenty-second.  While a contractual
> relationship was created between Lourdes
> Alvarez and defendant on the twelfth, and
> defendant is a "creditor" within the meaning
> of the Act, §§ 226.8(a) and 226.2(kk) cannot
> be read to require disclosure on the twelfth,
> when Lourdes Alvarez became obligated to
> purchase the car, because the Act only
> requires disclosure before the extension of
> credit, which did not occur before the twenty-
> second. **
> *

Id. at *15-16 (footnotes omitted).

While Alvarez recognizes situations like the one before the Court, it disagrees with Copley and concludes that the TILA disclosures are not necessary until the actual credit is extended. This Court disagrees with Alvarez because, as stated above, the TILA would be circumvented if sellers could contractually bind consumers to a purchase transaction only to hold all the terms of the credit arrangement in secrecy until it was known that the consumer could not pay cash to complete the transaction. Accordingly, the plaintiffs' claim that the defendants failed to make disclosures prior to signing a Form 500 is a violation of the TILA as a matter of law.  Summary judgment must be granted to plaintiffs on this issue.

B. *TILA - concealing fees and finance charge*

The plaintiffs claim that the defendants violated the TILA by charging a $375 "closing cost" in the total amount financed. Specifically, the plaintiffs maintain that closing costs are charged by Elsea, and not a third party, in violation of the TILA. In response, the defendants claim that the "closing cost" is

charged in every Elsea sale, including cash sales. Thus, the
defendants argue that this is not a "closing cost," and, therefore,
not a violation of TILA. At issue, therefore, is whether there are
or are not genuine issues of material fact regarding whether the
defendants charged a "closing cost" in transactions that involve
both cash and credit, or in transactions that involve only credit.
Compare Alston v. Crown Auto, Inc., 224 F.3d 332, 334 (4th
Cir.2000)("The district court found that Alston had produced no
evidence to prove that the $85.00 fee was incident to the extension
of credit and not charged in comparable cash transactions") with
Hook v. Baker, 352 F.Supp.2d 839, 844 (S.D. Ohio 2004)("The
defendant's documentary preparation fee was assessed because of the
extension of credit; in other words, the document fee was an
undisclosed finance fee")(footnote omitted).

 15 U.S.C. § 1605(a) defines "finance charge" in this way:

> Except as otherwise provided in this section,
> the amount of the finance charge in connection
> with any consumer credit transaction shall be
> determined as the sum of all charges, payable
> directly or indirectly by the person to whom
> the credit is extended, and imposed directly
> or indirectly by the creditor as an incident
> to the extension of credit. The finance
> charge does not include charges of a type
> payable in a comparable cash transaction. The
> finance charge shall not include fees and
> amounts imposed by third party closing agents
> (including settlement agents, attorneys, and
> escrow and title companies) if the creditor
> does not require the imposition of the charges
> or the services provided and does not retain
> the charges.

Therefore, an increase in the price of a manufactured home, for
example, that is not charged to cash customers, but is charged to
credit customers, solely because that consumer is paying credit,
triggers TILA's protections. Cornist v. B.J.T. Auto Sales, Inc.,
272 F.3d 322, 327 (6th Cir.2001).

It is unclear from the record that Elsea charges a "closing cost" in every manufactured home purchase. For example, the deposition of Thea Rogers, the employee who performed closings for Elsea, stated:

> Q. Now, how are you compensated for your work, what's your compensation arrangement?
>
> A. I make $50 per closing and a percentage off of my insurance sales.
>
> Q. So you're on commission for the insurance policies that you sell, correct?
>
> A. Yes.
>
> Q. Okay. And then the work that you do for Mr. Eitel you get paid a flat rate for each closing?
>
> A. Yes.
>
> Q. Okay. Any other compensation for Elsea in relation to the work that you do for Ms. Harrison or Mr. Eitel?
>
> A. No.
>
> Q. Okay. So, in addition to the $50 for closing, Mr. Eitel doesn't pay you a salary or a stipend or a draw or anything like that?
>
> A. A draw.
>
> Q. He pays you a draw?
>
> A. Yes.
>
> Q. Okay. And that's, then, reconciled with the $50 for the closing?
>
> A. Right.
>
> Q. Anything else?
>
> A. Anything else what?

Q. Compensation-wise.

A. No.

***

Q. Now, just want to make sure that I understand, I think we've established that it would be useful here, the closings that you do are for the transactions where a customer's buying a home from Elsea that's going to be financed by Mid Ohio; is that correct?

A. All of my transactions?

Q. Are those all of your transactions?

A. Would you repeat your question again?

Q. Yeah.  Are all your transactions, transactions in which a customer's buying a home from Elsea and that's going to be financed through Mid Ohio?

A. No.

Q. Okay.  What other kind of transactions do you close?

A. What we call a cash deal.

Q. And can you tell me how that works?

A. Outside financing.

Q. All right.  And just so we're clear, if I came to an Elsea lot and said I've got a loan of this amount from my local bank, that would be an outside financing deal, correct?

A. Correct.

Q. Okay.  You would nonetheless close that?

A. Yes.

Q. Okay.  Or if someone had cash to purchase a home, you would close that as well?

30

A. Yes.

(Dep. of Thea Rogers at pp. 18-21). Additionally, the record indicates that "closers" like Ms. Rogers were paid their $50 from the "closing costs." (Plaintiffs' Mot. for Summ. Judgment (doc. 142) at p. 44 ("A portion of the closing cost charge is paid as a commission to the Elsea, Inc. employee whose closing services Elsea requires be used"); Dep. of Thea Rogers at p. 18). However, the testimony of Joseph Szablewski sheds doubt on whether the "closing cost" fee was charged in both a credit and cash transaction. The record states:

> Q. Does Mid-Ohio Finance impose a loan origination fee in the transactions that are handled through Mid-Ohio Finance not the mortgage portion of it?
>
> A. Yes.
>
> Q. How is that computed? Is there a scale, is it a percentage, is just a flat rate?
>
> A. It's a flat rate.
>
> Q. And what is that flat rate in those transactions that Mid-Ohio Finance handles?
>
> A. I believe it's a currently $600.
>
> Q. Okay. And what does that pay for?
>
> A. It pays for the expenses incurred in underwriting and preparing underwriting, the loan and preparation.
>
> Mid-Ohio Finance basically pays for all the paperwork and the preparation of the paperwork.
>
> Q. Okay. You mean the paperwork that the closing agency is going to use to close the deal?
>
> A. Correct, all.

31

Q. Okay.  Who do you use to close those deals?

A. Employees.

Q. Okay.  Your employees?

A. Uh-huh.

Q. Okay.  Employees of Mid-Ohio Financial Services?

A. Employees of Elsea, Incorporated.

Q. In the transactions handled by Mid-Ohio Finance, again not the mortgage people, does Mid-Ohio Finance impose an underwriting fee?

A. You lost me on that.  Are you asking about the finance or –

Q. I'm talking about the finance.

A. Not the brokerage?

Q. Not Susan's part, your part.

A. We charge one fee.  That's a $600 fee.  We call it a closing fee and that encompasses everything.

Q. Does Mid-Ohio Finance charge an inspection fee in the transactions that you provide credit on, not the mortgage people?

A. We, again, charge one fee.

Q. One $600 fee for everything?

A. Right.

(Dep. of Joseph Szablewski at pp. 44-46).

Based on this testimony, it is unclear whether the defendants charged "closing costs" to both cash and credit customers or to credit customers *only*.  According to Ms. Rogers' testimony, she received $50, out of the "closing cost," regardless of the

purchasers' method of payment. However, that testimony is somewhat contradicted by Mr. Szablewski's testimony that the fees are charged in order to pay for, among other things, financing costs. Thus, because of this apparent conflicting testimony, the Court concludes that there are genuine issues of material fact surrounding whether the defendants charged "closing costs" in every transaction, both cash and credit, or to credit transactions only. The plaintiffs' motion for summary judgment must be denied on this issue.

### C. *RISA - charging and receiving closing costs*

The plaintiffs contend that by charging closing costs to credit customers, the defendants violated the RISA. In response, the defendants contend that the "closing cost," because it was charged to cash and credit customers alike, was part of the "cash price." Thus, the RISA restrictions are not triggered.

The RISA prohibits any retail seller from charging, contracting, for or receiving from any retail buyer, "any further or other amount for examination, service brokerage, commission, expense, fees, interest, or others things of value." Ohio Rev. Code § 1317.07. Ohio Revised Code § 1317.01(A) states that a retail installment sale

> includes every retail installment contract to sell specific goods, every consumer transaction in which the cash price may be paid in installments over a period of time, and every retail sale of specific goods to any person in which the cash price may be paid in installments over a period of time.

"Cash price" is defined as

> the price measured in dollars, agreed upon in good faith by the parties as the price at which the specific goods which are the subject matter of any retail installment sale would be sold if such sale were a sale for cash to be paid upon delivery instead of retail installment.

Ohio Rev. Code § 1317.01(K). The RISA does not require the "cash price" to be a fixed, predetermined amount to all consumers. Johns v. Ford Motor Credit Co., 49 Ohio St.3d 84, 87 (1990). "The test is not what is the seller's price for the goods for all buyers or even the retail price suggested by the manufacturer, but whether the price to a particular buyer was agreed upon in good faith negotation." Id. Finally, "[s]pecific goods means goods, including related services, identified and agreed upon at the time a contract to sell or a sale is made." Ohio Rev. Code § 1317.01(D).

There appears to be little case law on what is deemed part of the "cash price" or what is a "related service" under the definition of "specific goods." For guidance, however, the Court notes the Ohio Supreme Court's examination of Chapter 1317, which states:

> Chapter 1317 was enacted by the General Assembly in order to correct certain abuses existing in the field of dealer participation in the financing of sales made on the installment plan, ... the abuses directly responsible for the legislation centered in the area of automobiles, both new and used. Such unregulated dealer participation resulted in activities amounting to fraud on the general public in the nature of hidden and disguised profits included not in the sale price of the automobile but in the cost of the finance plan. R.C. 1317 was not intended to legislatively fix the price for goods, but has as one of its objectives, meaningful disclosure to the consumer of credit terms, so as to avoid uninformed use of financing plans. The statute requires that at the time of undertaking the obligation, the buyer be informed in writing of the actual price of the goods, and of any trade-ins affecting such price.

Johns, 49 Ohio St.3d at 88 (internal citations and quotations omitted). Additionally, the Court refers to Bullucks v. General

34

<u>Motors Acceptance Corp.</u>, 8 Ohio App.3d 427 (1st Dist.1983) for guidance.

At issue in <u>Bullucks</u> was whether including the cost for warranties against breakdown or faulty workmanship was appropriately included in the "cash price" under the guise of "specific goods" and "related services." <u>Id.</u> The court concluded that it was:

> It is a matter of common knowledge, of which judicial notice will be taken, that warranties of varying lengths and coverages accomany most, if not all, new car sales. Indeed, considerable emphasis is placed by the various makers in their advertising on the alleged superiority of their warranties, *vis-a-vis* their competitors. While no separate identifiable charge to buyers is made for these warranties, it is not to be presumed that they are without substantial cost to the manufacturer to make and are not, therefore, calculated along with all other costs in determining the ultimate basic sale price of the automobile. Neither is it to be presumed that these warranty practices are without interest to buyers and thus without advantage to the manufacturers; highly competitive commerce does not customarily engage inexpensive feckless acts. It seems to us indisputable that the furnishing of warranties against breakdown or faulty workmanship in the sale of new cars is a service to buyers both expected and demanded; that it is, indeed, a "related service" to the specific goods involved in the sale just as surely as transportation charges or preparation costs would be.
>
> In the sale of used cars, however, no such universal custom or practice appears to exist. Warranties accompanying the sale of used cars appear to be a matter of sellers' choice or a matter of negotiation between the parties. In the instant case, the Retail Buyer's Order indicates that the seller offered the plaintiff several choices, one of which was

> stated as "Unit Sold 'As Is' No Warranty
> Expressed Or Implied." The plaintiff elected
> the form of warranty described as "D.A.C.
> Mechanical Insurance" and agreed to pay $185
> therefor. So far as the instant question is
> concerned, we see no difference between this
> procedure and that which controls in new car
> sales, where the warranty would have been
> furnished automatically and the $185 cost
> would appear as part of the basic sale price.
> Both instances appear to us to involved
> "related services" within the meaning of R.C.
> 1317.01(D) and, therefore, are part of the
> cash price of the specific goods which, under
> R.C. 1317.04, becomes a component of the
> principle balance upon which finance charges
> may be imposed.

Id. at 429-30 (internal citation omitted).

What is important to note in the instant case is that, as indicated, *supra*, there are genuine issues of material fact surrounding whether the defendants charged a "closing cost" in every sale of a manufactured home, regardless of whether the buyer was paying cash or financing the purchase. If the "closing cost" was charged to both cash and credit customers alike, then the "closing cost" fee could legally be included in the "cash price." Although charging this type of "closing cost" may not be as uniform to the manufactured home industry as a warranty is to buying an automotive, Bullucks, 8 Ohio App.3d at 429-30, if the defendants charged this fee to all buyers, then the Court must conclude that it was part of the "cash price" when buying a manufactured home from the defendants. Cf. Hook, 352 F.Supp.2d at 844 (charging a $200 documentary fee to credit only customers violated TILA). However, it would be a violation of the the RISA if that fee was charged to credit transactions only. Thus, genuine issues of material fact exist as to whether the "closing cost" fee was charged to both credit and cash customers. Summary judgment on this issue must be denied.

36

VII.

The plaintiffs claim that because the defendants failed to deliver the McWhorters' tie downs and home skirting for ten months after the sale, the plaintiffs violated the delivery rule. In response, the defendants argue that they did not violate the delivery rule because they never received payment from the McWhorters. Moreover, the defendants contend that the delivery rule remedy, which is a refund, is not applicable here because the only money to exchange hands in the McWhorter/defendant sales transaction was a down payment that was insufficient to cover the sales tax.

Ohio Administrative Code § 109:4-3-09 states, in relevant part:

> (A) It shall be a deceptive act or practice in connection with a consumer transaction for a supplier ...
>
> (2) To accept money from a consumer for goods or services ordered by mail, telephone, or otherwise and then permit eight weeks to elapse without:
>
> (a) Making shipment or delivery of the goods or services ordered;
>
> (b) Making a full refund;
>
> (c) Advising the consumer of the duration of an extended delay and offering to send the consumer a refund within two weeks if the consumer so requests; or
>
> (d) Furnishing similar goods or services of equal or greater value as a good faith substitute if the consumer agrees.

Ohio Admin. Code § 109:4-3-09. It appears that Ohio courts strictly construe the plain meaning of this Ohio Administrative Code and conclude that there is a violation if goods or services are not delivered within the eight-week window. See, e.g., Koester

37

v. Baur, No. 68969, 1996 WL 75702 (Ohio App. 8th Dist. Feb. 22, 1996)($1045 down payment for a car that was not delivered within the eight-week time frame was a violation of Ohio Admin. Code § 109:4-3-09); Lawson v. Mack, No. L-90-230, 1991 WL 59890 (Ohio App. 6th Dist. Apr. 19, 1991)("The given facts in this case reveal that appellee accepted $4,154.18 from appellant for goods and services; did make or offer a refund or appellant's money; and did not furnish similar goods or services within eight weeks.  This is clearly a violation of ... Ohio Admin. Code § 109:4-3-09").

The record is undisputed that the defendants did not deliver the skirting and tie downs until nearly ten months after the McWhorters purchased their manufactured home.  This is a violation of the delivery rule.  The defendants cannot have it both ways, i.e. they cannot argue that items such as "closing costs" must be included in the "cash price" so that there was no violation of law, but, at the same time, claim that the $550 down payment was insufficient to trigger the delivery rule because the down payment was less than the sales tax.  The Court notes that the sales tax is part of the "cash price," so the $550 down payment was a down payment off of that "cash price."  For the McWhorters, the Form 500 reflects this.  Thus, the record demonstrates that the defendants accepted money from the McWhorters for the tie downs and skirting and over eight weeks elapsed before those were delivered.  Accordingly, summary judgment must be granted to the plaintiffs on this claim.

### VIII.

Both parties move for summary judgment on the Plaintiff's Equal Credit Opportunity Act claim.  The plaintiffs contend that the defendants violated the ECOA when they sought out and received Bank One's lending options of a 9% annual interest rate for 120 months and a 10% down payment but failed to inform the McWhorters of Bank One's rates prior to extending a more unfavorable credit

package to the McWhorters. Conversely, the defendants argue the Court should not disturb the dismissal of the ECOA claim in the September 11, 2003 Opinion and Order (doc. #76). Specifically, the defendants claim that the Court was correct in concluding that the notice requirements of the ECOA do not extend to the defendants given the fact that the defendants did not take adverse action against the plaintiffs.

Under the ECOA, a creditor, after receiving a completed application for credit, must provide a statement of the reasons for any adverse action it takes in connection with a credit application. 15 U.S.C. § 1691(d)(2). The Act defines "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). As this Court, as well as other Courts of Appeals, have previously noted, the purpose of the ECOA notice requirement is as follows:

> The requirement that creditors give reasons for adverse action is, in the Committee's view, a strong and necessary adjunct to the anti-discrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices. Yet this requirement fulfills a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit. Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change in employment, or their already over-extended financial situation. In those cases where the creditor may have acted on misinformation or inadequate information, the

39

> statement of reasons gives the applicant a
> chance to rectify the mistake.

(Opinion and Order (doc. #76) at p. 13(citing 147 S.Rep. No. 94-
589, 94 th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. &
Admin. News, pp. 403, 406); see also Treadway v. Gateway Chevrolet
Oldsmobile Inc., 362 F.3d 971, 977 (7th Cir.2004)(citing same);
Jochum v. Pico Credit Corp. of Westbank, Inc., 730 F.2d 1041, 1043
(5th Cir.1984)(citing same).

The plaintiffs rely heavily on Padin v. Oyster Point Dodge,
397 F.Supp.2d 712 (E.D. Va.2005).  In Padin, the plaintiff sought
to purchase an automobile from Oyster Point Dodge, the defendant.
Oyster Point Dodge assisted the plaintiff in obtaining financing
for the purchase by using a computer system to search out possible
financing options.  One company, CPS, responded favorably
indicating that it would provide financing at an annual interest
rate of 16.95% and would allow Oyster Point to add an additional 2%
for having arranged the transaction.  The plaintiff accepted the
rate of 18.95% and purchased the automobile.  Three weeks after the
purchase, the plaintiff discovered that his financing was not
approved and returned the vehicle.  CPS sent the plaintiff a notice
letter of its adverse action.  However, Oyster Point Dodge did not
give notice of adverse action.  Subsequently, the plaintiff sued
Oyster Point Dodge for violating the ECOA.  The court concluded
that because Oyster Point Dodge was a "participating creditor" and
did not provide the plaintiff with notice of adverse action, it
violated the ECOA.  The court stated:

> The Federal Reserve Board has clearly
> indicated that merely "selecting creditors to
> whom applications will be made" does not make
> one a "creditor" for purposes of the notice
> requirements of the ECOA.  In that situation,
> at least one lender is given the opportunity
> to decide whether to extend credit.
> Therefore, it is the lender, rather than the
> dealer, that makes the credit decision...

[sic] Moreover, if the dealer sends the application to at least one lender, there is another party that can provide notice to the applicant.

Therefore, although the Defendant exercised its discretion in deciding to whom to "shop" the Plaintiff's credit application, such "participation" alone does not make it a "participating creditor" for purposes of requiring it to abide by the notification provisions in the event of an adverse credit decision. Moreover, the Defendant did not request that the Plaintiff find a cosignor, demand a higher down payment, or negotiate with the Plaintiff to set a higher interest rate. Nevertheless, there is a remaining aspect of the situation that appears to be dispositive, namely, whether the Defendant participated in "setting the terms of the credit," thereby benefitting from the loan. The Court in *Treadway* clearly identifies the situation in which the automobile dealer "gets part of the action" by receiving at least a portion of the interest rate above that which the lender was prepared to charge in order to make the loan:

If [the dealer] set an APR higher than the rate upon which the lender would otherwise agree to extend credit, [the dealer] and the lender would split the incremental proceeds, known as the "reserve." Therefore, [the dealer] could increase the APR in order to induce the lender to agree to extend credit and in so doing, it was also "setting the terms of the credit" and benefitting from the loan.

Here, although the lender (CPS) was prepared to grant the loan at the "buy" rate, and the Defendant was apparently prepared to forego the benefit of its piece of the interest pie to "make the deal," the Defendant didn't forego the opportunity to benefit from the additional "reserve" increase and, therefore, it became a "participating creditor" required to give notice to the consumer of any adverse

41

> credit decision by virtue of a higher interest
> rate being charged than would otherwise have
> been required by the lender.

Id. at 720 (internal citations and footnotes omitted).

The facts of the instant case are readily distinguishable from Padin. This is not a case where the defendants became a "participating creditor" by benefitting from a reserve. Here, the defendants became the sole beneficiary of the financing package and did not agree to split the incremental proceeds with Bank One by adding an additional percentage rate to the APR offered by Bank One.

In the instant case, Elsea contacted Bank One in order to determine at what rate Bank One would purchase the retail installment contract from Elsea, not at what rate and terms Bank One would lend to the McWhorters. As the Court's previous Order states:

> Plaintiffs' theory that notice was required is
> based upon its factual assertion that Elsea
> was applying to Bank One for credit on
> plaintiffs' behalf. The record, however, does
> not support plaintiffs' assertion. Rather,
> Elsea contacted Bank One during defendant's
> credit approval process to determine whether
> and on what terms Bank One would purchase the
> retail installment sale contract from Elsea.
> Thus, it was never contemplated that Bank One
> would extend credit directly to plaintiffs.

(Opinion and Order (doc. #76) at p. 13-14). According to the record, this was a typical practice for Mid-Ohio Financial.

> Q. Okay. And I just want to see if I
> understand. Mid-Ohio Finance in effect
> carries the note itself or the consumer's
> obligation as opposed to giving it to a third-
> party as Mid-Ohio Mortgage does?
>
> A. Mid-Ohio Finance sells the note off to
> another banking institution at some point in
> time.

Q. But they're originally playable to Mid-Ohio Finance, is that right, and then signed?

A. Correct.

Q. So the credit department at Mid-Ohio Finance would review and approve transactions involving the credit purchase of a mobile home where the consumer's obligation is going to be made payable to Mid-Ohio Finance who at some time in the future may discount or sell it to a third party in order to cash it out?

A. Okay. I guess to clarify that a little bit. Mid-Ohio Finance does do that but it also has to abide by certain guidelines of the bank.

Q. As to which ones they're going to buy?

A. Correct, ultimately will buy.

Q. So they want to have consumer obligations to fall within the range of what this third party bank or whatever has said, yes, we'll buy those from you?

A. Right.

Q. And those factors go into, I assume, the credit department's determination as to which ones are approved and not?

A. Absolutely.

(Dep. of Joseph Szablewski, July 6, 2000, at pp. 28-29).

Nowhere in the plaintiffs' motion for summary judgment do they claim that there are factual inaccuracies with this conclusion. As noted, the record indicates that Mid-Ohio Finance regularly seeks out other banks' rates prior to lending to Elsea customers in order to determine whether to deny or extend credit and at what interest rate to extend credit because Mid-Ohio Finance, after extending credit to Elsea customers, liquidates the installment contract by selling it at a discount to banks. Because the defendants sought

43

Bank One's information for their personal use in determining how to make a profit if they chose to sell retail installment contracts at a discounted rate, the fact that the defendants did not disclose Bank One's credit terms to plaintiffs cannot be constituted as "adverse action." Accordingly, the Court agrees with its early disposition in the September 11, 2003 Opinion and Order (doc. #76). The plaintiffs' motion for summary judgment will be denied, and the defendants' motion for summary judgment will be granted on this issue.

IX.

The plaintiffs seek injunctive relief for all of the defendants' activities that violate the CSPA. See Ohio Rev. Code § 1345.09(D). However, because the Court concluded that genuine issues of material fact surround all claims involving the CSPA, the Court cannot grant injunctive relief at this time.

X.

Pursuant to Fed.R.Civ.P. 56(d), the plaintiffs requested that the Court establish what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. That rule states:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts exist are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

44

Fed.R.Civ.P. 56(d). The Court believes that this Opinion and Order adequately identifies all material factual disputes on those claims when summary judgment is not being granted and therefore complies with Rule 56(d).

## XI.

Based on the foregoing, summary judgment is GRANTED to the defendants on the ECOA claim and the MMWA claim. Summary judgment is GRANTED to the plaintiffs for the defendants' violation of the delivery rule and the violation of the TILA as it relates to the requisite disclosures prior to the plaintiffs signing the Form 500. Finally, summary judgment is DENIED to the TILA claim for concealing fees and financing charges; the RISA claim for charging and receiving closing costs; the violation of the express warranty claims; the violation of the CSPA for all warranty claims; all claims involving excess insurance rates; and the injunctive relief claims.

/s/ Terence P. Kemp
United States Magistrate Judge